EMPLOYMENT AGREEMENT

AGREEMENT dated as of February 8, 2000, between Hyde Park Communications, LLC, a District of Columbia limited liability company (the "Company") and Paul DelPonte (the "Executive").

W I T N E S S E T H:

WHEREAS, the Company, the Executive, and Jeffrey Sandman (the "Investors") have executed an Operating Agreement regulating the operation of the Limited Liability Company (the "Operating Agreement"); and

WHEREAS, the Company desires to employ the Executive as one of the Company's two initial Principals and the Executive desires to accept such employment;

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration in hand paid, the parties hereto, intending to be bound, agree as follows:

1. <u>Employment</u>. The Company hereby employs the Executive as a Managing Director and the Executive hereby accepts such employment upon the terms and conditions hereinafter set forth.

2. <u>Term</u>. This Agreement shall commence on the date hereof and shall terminate as of the earliest of:

(a) The expiration of the initial term of two years or thereafter on 90 days' prior notice from either party to the other;

(b) the death of the Executive;

(c) if either the Executive or the Company shall have been in default of any provision of this Agreement and such default shall have continued for 15 days after notice to the defaulting party, provided however that said 15-day period shall be extended for such period of time necessary to effectuate a cure of such default so long as (i) the default is curable, (ii) the cure is promptly commenced within such 15-day period, and (iii) the defaulting party diligently pursues a cure of the default;

(d) following "cause" defined as (i) conviction of a felony, (ii) an employment-related act of dishonesty which could reasonably be expected to have a material adverse effect on the Company, (iii) a failure to report to work for a period of more than one week, for other than health-related reasons, without notice to the Company, (iv) the Executive's refusal, without

-1-

good cause, to perform the duties consistent with his position as reasonably assigned to him by the members of the Company; (v) any event that constitutes "cause" as to the Executive in his capacity as a member under any operating agreement of the Company; or

    (e) The Executive's "disability" defined as his failure, due to a physical or mental ailment, to render his usual and normal duties for ninety successive days or for shorter periods aggregating one hundred eighty days or more during any period of twenty-four months.

The exercise of the right of the Company or the Executive to terminate this Agreement pursuant to clause (c) or (d) hereof, as the case may be, shall not abrogate the rights and remedies of the terminating party in respect of the breach giving rise to such termination. If this Agreement is terminated by Executive pursuant to clause (c) hereof, the Executive shall not be required to mitigate damages otherwise obtainable from the Company as a result thereof and any income received by the Executive after such termination shall not reduce the amount of damages otherwise obtainable from the Company hereunder.

3. <u>Compensation and Benefits</u>.

    (a) The Executive's compensation, including the amount and frequency of salary payments, bonuses, and advances against distributions, shall be commensurate with his training, experience, responsibilities, and contribution to the Company, as these same shall be determined annually or more frequently by the Members in their sole reasonable discretion. Notwithstanding the foregoing, Executive shall receive minimum compensation of $1,000 each month, and the amount of the Executive's compensation shall be reviewed no less frequently than quarterly.

    (b) During the term of his employment, the Executive shall be entitled to participate in employee benefit plans or programs of the Company, if any, to the extent that his position, tenure, salary, age, health and other qualifications make him eligible to participate, subject to the rules and regulations generally applicable thereto. The Executive shall be entitled to four weeks of vacation with full pay to be taken in accordance with the reasonable practice of the Company. Vacations are to be computed on a calendar-year basis and may not be accumulated from year to year.

4. <u>Expenses</u>. The Executive shall be entitled to reimbursement of all expenses incurred by him in the performance of his duties, subject to the presenting of appropriate vouchers in accordance with generally applicable Company policy as presented to him from time to time.

5. <u>Extent of Services</u>:  The Executive devote his full professional time and attention to his service to the Company.  The foregoing shall not be construed as preventing the Executive from (a) maintaining any current investments, including an investment in Nelson Public Relations, (b) investing his personal assets in the future in businesses which do not compete with the Company in such form or manner as will not require any services on the part of the Executive in the operation or the affairs of the companies in which such investments are made and in which his participation is solely that of an investor, (c) purchasing securities in any corporation the securities of which are regularly traded provided that such purchase shall not result in his collectively owning beneficially at any time two percent or more of the equity securities of any corporation engaged in a business competitive to that of the Company, (d) participating in conferences, preparing or publishing papers or books, or teaching, and (e) performing reasonable volunteer service for businesses and others which do not compete with the Company or are Clients or potential Clients of the Company.  The Executive shall inform the Members of the Company of any activity described in clause (c) above.

6. <u>Insurance</u>.  The company may, at its election and for its benefit, insure the Executive against accidental loss or death and the Executive shall submit to such physical examination and supply such information as may be required in connection therewith.

7. <u>Location of Performance</u>.  The Executive's services will be performed in the Washington metropolitan area.  The parties acknowledge, however, that the Executive may be required to travel in connection with the performance of his duties hereunder.

8. <u>Restrictive Covenants</u>.

    (a) Non Disclosure/Confidentiality:  Executive acknowledges and agrees that:

    (i) the work he is retained to perform for Company necessarily involves Executive's having access to certain confidential and proprietary information, including, but not limited to, techniques, procedures, technical data, marketing strategies, lists of Company's Clients and vendors, Company's Client and vendor relationships, financial information, and other similar information or documents developed or acquired by Company (including all information developed or acquired by Executive in the course of his employment with Company) (the "Confidential Information");

    (ii) the Confidential Information is a valuable, asset of Company; Company has a legitimate business interest in

-3-

protecting its confidentiality; and Company has implemented such practices and measures as are reasonably necessary to preserve and to protect its confidentiality;

(iii) Executive shall not use the Confidential Information or use or exploit any relationships developed during her retention with Company in any manner other than in furtherance of Company's interests; and

(iv) Executive shall maintain all Confidential Information in the strictest confidence; shall not disclose the Confidential Information to any person or entity outside Company during the term hereof and for a period of five years subsequent to his termination, whether such termination is voluntary or involuntary; and shall return any Confidential Information in tangible form to Company upon such termination.

(b) Non-Competition. During the term of his retention with Company, and for a period of one year following any termination other than an involuntary termination without cause or a termination by the Executive under Paragraph 2(c) hereof, Executive shall not, directly or indirectly, for Executive or on behalf of or in conjunction with any other person or entity, solicit, take, handle, represent, interfere with, or divert any of the Clients to any competitor of Company now or hereafter operating anywhere; nor shall Executive solicit or recruit any other employee of Company to form or join another business. This Paragraph 8(b) shall not be construed to prevent Executive from being hired as a bona fide employee by any Client of the Company provided that he does not engage, in his employment, in any of the acts proscribed by this paragraph.

(c) Independent Agreements. These restrictive covenants shall be construed as agreements independent of any other provision in this Agreement, and the existence of any claim or cause of action of Executive against Company, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of any of these restrictive covenants. Company has fully performed all obligations entitling it to the restrictive covenants, and the restrictive covenants therefore are not executory or otherwise subject to rejection under the Bankruptcy Code.

(d) Public Policy. If any portion of any restrictive covenant is held by a court of competent jurisdiction to be unreasonable, arbitrary, or against public policy for any reason, the restrictive covenant in question shall be considered divisible as to line of business, time, and geographic area. If a court of competent jurisdiction should determine the specified lines of business, the specified period, or the specified geographic area to be unreasonable, arbitrary, or against public policy for any reason, a narrower line of business, a lesser

period of time, or a smaller geographic area that is determined to be reasonable, non-arbitrary, and not against public policy for any reason, may be enforced by Company against Executive.

(e) Clients. For purposes of this Paragraph 8 and this Agreement, the term "Client" shall specifically include, but not be limited to any client actively represented by Company as of the relevant date or within one year prior thereto and a prospective Client with whom Company, as of the relevant date or within six months prior thereto, is or was engaged in active negotiation for representation.

9. Remedies.

(a) The parties hereto acknowledge and stipulate that breach of the restrictive covenants set forth in Paragraph 8 would irreparably harm Company and cause significant damage and loss to Company and that, in such event, Company would have no adequate remedy at law. The parties further acknowledge that money damages for such breach are difficult, if not impossible, to calculate and that the most appropriate relief in the event of breach would be injunctive relief. In the event of a breach or threatened breach by Executive of any of the provisions of the restrictive covenants set forth in Paragraph 8, and notwithstanding Paragraph 9(b) respecting arbitration, Company shall be entitled to entry of a temporary or permanent injunction, without bond of any kind, restraining Executive and his employer, affiliate, partner, or joint venturer from directly or indirectly providing professional services in violation of the restrictive covenants. Executive agrees to pay to Company all costs and expenses, including reasonable attorney's fees, as may be incurred by Company relative to obtaining a temporary or permanent injunction.

(b) Any controversy or claim arising out of or relating to this Agreement, other than a controversy or claim arising out of breach of the restrictive covenants set forth in Paragraph 8, shall be finally resolved by arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Any such arbitration shall take place in Washington, D.C., before a single arbitrator chosen in accordance with such Rules. The arbitrator shall include arbitration costs and attorneys' fees in the award to the prevailing party in any such proceeding. The award in such proceeding shall be final and binding on the parties, and judgment on the arbitrators' award may be entered in any court having the requisite jurisdiction. Nothing in this Agreement shall require the arbitration of disputes between the parties that arise from actions, suits or proceedings instituted by third parties.

(c) Should an action be brought by Company against Executive under Paragraph 9(a) or 9(b) to enforce any restrictive covenant, the period of restriction shall be deemed to begin running on the date of entry of an order granting Company any relief and shall continue uninterrupted for the next succeeding year; Executive acknowledges that such purpose and effect would be frustrated by measuring the period of restriction from the date of termination of this Agreement where Executive failed to honor the restrictive covenant until directed to do so by court order.

(d) Notwithstanding that Company does not have an adequate remedy at law for a breach of the restrictive covenants set forth in Paragraph 8 hereof, the parties hereto stipulate and agree that in the event of breach of said restrictive covenants, Company will suffer damages during the period of time in which Executive competes or attempts to compete with Company. Furthermore, the parties stipulate and agree that the precise amount of damages incurred by Company in such circumstances would be difficult, if not impossible, to calculate and, therefore, the parties stipulate and agree to imposition of liquidated damages for each Client actually lost by Company to Executive or any person or entity with which Executive becomes associated, in an amount equal to the greatest of:

(i) twenty-five percent of the gross fees paid by such lost Client to Company for the 12-month period immediately preceding Executive's breach;

(ii) twenty-five percent of the gross fees paid by such lost Client to Executive, or any person, or entity with which Executive becomes associated during the 12-month period immediately following Executive's breach; or

(iii) twenty-five percent of the gross fees paid by such lost Client to Company for the twelve-month period immediately prior to Company's ceasing to represent such Client.

(e) In addition to the above, any breach of Paragraph 8 hereof shall also be deemed an automatic forfeiture on the part of Executive of any payments or amounts due or to become due to Executive pursuant to this Agreement or otherwise arising from, directly or indirectly, his retention by Company, including, but not limited to, salary, bonuses, retirement, pension, profit sharing, deferred compensation, or other benefits and any payments due him under the Operating Agreement.

(f) All remedies given to Company by this Agreement shall be construed as cumulative remedies and shall not be alternative or exclusive remedies.

10. <u>Assignment</u>. This Agreement may not be assigned by any party hereto; provided that the Company may assign this Agreement in connection with a merger or consolidation involving the Company or a sale of substantially all its assets to the surviving corporation or purchaser, as the case may be, so long as such assignee assumes the Company's obligations thereunder.

11. <u>Notices</u>. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and sent by registered mail to the Executive at his last known residence or to the Company at the address of its principal office and shall be deemed given when so mailed.

12. <u>Waiver of Breach</u>. A waiver by the Company or the Executive of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by the other party.

13. <u>Entire Agreement</u>. This instrument contains the entire agreement of the parties. It may be changed only by an agreement in writing signed by a party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

HYDE PARK COMMUNICATIONS, LLC

By: _____
Jeffrey Sandman, CEO

_____
PAUL DELPONTE