## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

HYDE PARK COMMUNICATIONS, INC., et al.　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiffs,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　　　　) Case Number: _____
　　　　　　　　　　　　　　　　　　　　)
PAUL DELPONTE　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　　　　　　　)

## PLAINTIFFS' STATEMENT OF POINTS OF LAW AND AUTHORITY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### INTRODUCTION

This claim for injunctive relief arises from the actual and threatened misuse of confidential information and trade secrets by defendant Paul DelPonte (hereinafter "DelPonte").

DelPonte sent a letter containing false and inflammatory charges regarding his former employer Hyde Park Communications, Inc. (hereinafter "Hyde Park") and its president Jeffrey Sandman (hereinafter "Sandman") to Hyde Park and Sandman. In the process, DelPonte misused Hyde Park's confidential and trade secret information by appending to the letter a "cc" (carbon copy) list of the names of Hyde Park's principal client and media contacts with the intention of conveying the impression that these contacts had received a copy of the letter.

This misuse of the contacts list was done in an effort to inflict emotional harm on Sandman and to intimidate Sandman and Hyde Park into acceding to certain of DelPonte's improper demands. This actual and threatened misuse of Hyde Park's confidential and trade secret information represents a breach by DelPonte of his employment agreement with Hyde Park and a

1

violation of the D.C. Trade Secrets Act § 36-401 et seq. (hereinafter the "Trade Secrets Act").

Hyde Park and Sandman seek injunctive relief to prevent the further misuse of the contacts list and other confidential and trade secret information of Hyde Park. Hyde Park also seeks injunctive relief to obtain the return to Hyde Park of a laptop computer given to DelPonte by Hyde Park that contains, on information and belief, the contacts list and other confidential and trade secret information. DelPonte retains this computer despite numerous demands by Hyde Park for its return.

## BACKGROUND

### 1.    General Information

Hyde Park is a corporation organized and operating under the laws of the District of Columbia. Hyde Park provides public affairs, corporate communications, and media relations to its clientele comprised of Fortune 500 companies, major foundations, national advocacy and membership organizations, and individuals.

On or about February 8, 2000, Hyde Park and DelPonte entered into an employment agreement (hereinafter the "Employment Agreement") whereby DelPonte accepted a position as an employee of Hyde Park. Between February 8, 2000, and December 5, 2005, DelPonte served as an employee of Hyde Park. DelPonte currently is a minority shareholder of Hyde Park. A copy of the Employment Agreement is attached to the Complaint as Exhibit 1 and is incorporated herein by reference.

Prior to March 30, 2006, Hyde Park and DelPonte engaged in negotiations unsuccessfully to resolve certain claims by DelPonte for back salary, for the distribution of Hyde Park's profits,

2

and for the purchase by Hyde Park of his shares of stock.

**2.     The March 30, 2006 Letter from DelPonte**

On March 30, 2006, DelPonte sent a letter by facsimile to Hyde Park and Sandman that

contained false and inflammatory statements and charges and used confidential and trade secret

information in breach of the Employment Agreement and of the District of Columbia Uniform

Trade Secrets Act, D.C. Code §§ 36-401 et seq. (hereinafter, the "March 30 Letter"). A copy of

the March 30 Letter is being filed under seal and its terms are incorporated herein by reference.

DelPonte indicated, through a "carbon copy" list attached to the letter, that these

falsehoods and potentially defamatory statements had been published to 21 individuals. These

individuals included the contacts of clients of Hyde Park that have been responsible for generating

more than fifty percent (50%) of Hyde Park's historic revenue and principal media contacts of the

company. Affidavit of Jeffrey Sandman, ¶ 28. The Affidavit of Jeffrey Sandman is attached hereto

as c 1 and incorporated herein by reference..

**a.     Falsehoods and Inflammatory Statements in the March 30 Letter**

The March 30 Letter is replete with falsehoods and malicious statements. Among the

false assertions in the March 30 Letter, DelPonte accused Sandman and Hyde Park of "disturbing

attempts to withhold company profits that have already been reported to the IRS." Such

language is reasonably understood to mean that Hyde Park failed to remit amounts actually owed

to IRS or a third party. However, no agreement between Hyde Park and DelPonte nor any

requirement of law gives DelPonte or any other Hyde Park shareholder the ability to compel a

distribution. Moreover, Hyde Park has always timely reported all of its profits to the IRS and has

made periodic distributions of its profits to its shareholders in the form of cash dividends. Exhibit

3

1, ¶ 17.

DelPonte also stated that Sandman "randomly picked" an "artificial" deadline of March 18, 2006, for DelPonte to obtain health coverage for the month of April and that Sandman did this as "a bargaining tool in an attempt to force me to settle for an offer drastically undervaluing the money you and Hyde Park Communications owes [sic] me."

When DelPonte left the company's employ in December 2005, he was told that Hyde Park could and would maintain his coverage, at his expense, for three months to the end of March 2006. Hyde Park has had no obligation to keep DelPonte on its health insurance policy. Exhibit 1, ¶¶ 19-20.

In an email from Hyde Park's counsel to DelPonte's counsel, dated February 23, 2006, Hyde Park presented a settlement proposal that included an extension of coverage through June 2006 (after the company first learned that this was feasible), with an indication that the premium payments would have to be made by the 15th day of the previous month. Exhibit 1, ¶ 21.

In a subsequent email from Hyde Park counsel dated March 9, 2006, Hyde Park extended the deadline for acceptance of the proposal and payment of the April premium to March 18. The deadline was intended to give Hyde Park sufficient notice so that either the premium could be remitted if the parties reached an agreement and DelPonte elected coverage or notice of termination of coverage could be delivered if no settlement was reached or DelPonte elected not to be covered. Exhibit 1, ¶ 22.

DelPonte further asserted that his attorney "specifically asked if the March 18 deadline that [Sandman] randomly picked to discontinue my health insurance was in fact correct. There was response from you or your attorney." As a result, according to DelPonte, he "was denied

4

purchasing a new policy from another insurance carrier because I was told I already had a policy from Hyde Park."

Neither Sandman nor Hyde Park ever received any letter from DelPonte's attorney inquiring whether the March 18 deadline "was in fact correct." Instead, Sandman and Hyde Park received a letter dated March 23 confirming that Mr. DelPonte's health insurance would be lapsing (as was correct) and requesting notice only if Hyde Park's understanding were otherwise. Sandman and Hyde Park did not respond because their understanding agreed with DelPonte's. Exhibit 1, ¶ 24.

DelPonte also asserted that his trouble obtaining health insurance was actually a result of Sandman's "twisted game of Catch 22 [that] came dangerously close to putting scheduled surgery for my son next week at risk. There was simply no need for the stress and anguish your power trip caused my family and me." As noted above, Sandman did not engage in any "game" of Catch 22; nor did he do anything improper in notifying the company's health insurance carrier when he did that DelPonte was no longer to be covered by that insurance.

DelPonte closed the March 30 Letter with a "carbon copy" list of 21 individuals to whom DelPonte indicated he had sent or intended to send the letter. The individuals listed consisted of representatives of many of Hyde Park's principal clients and important members of the media with whom Hyde Park has conducted business.

As noted in the attached affidavit of Jeffrey Sandman, the March 30 Letter caused Sandman distress that the distribution to the persons on the carbon copy list of the false and inflammatory contents of the March 30 Letter would destroy the reputation and goodwill that Hyde Park and he had established over decades of diligent work. This resulted in Sandman's

5

having difficulty eating, sleeping, concentrating, and carrying on the other usual activities of daily life.  Exhibit 1, ¶ 35.

In order to mitigate the unwarranted injury likely to flow from the March 30 Letter, Mr. Sandman on his own behalf and on behalf of Hyde Park sent a letter on March 31, 2006, to the individuals listed on the carbon copy list of that letter, stating that the complaints had no merit.  A copy of one of the letters sent on March 31, 2006 is attached to the Complaint as Exhibit 3 and is incorporated herein by reference.

On April 3, 2006, Hyde Park's attorney sent a letter to DelPonte's attorney in which he raised concerns about the accuracy of the March 30 Letter, its publication to third parties, and the resulting defamation, violation of trade secrets law, and breach of the Employment Agreement (hereinafter the "April 3 Letter").  In the April 3 Letter, Hyde Park's attorney requested that DelPonte apologize for his remarks and refrain from any further publication.  The April 3 Letter also stated that Sandman and Hyde Park were entitled to seek injunctive relief and reserved the right to do so. A copy of the April 3 Letter is attached to the Complaint as Exhibit 4 and is incorporated herein by reference.

On April 5, 2006, DelPonte's attorney wrote to Hyde Park's lawyer that, notwithstanding the "carbon copy" list, the March 30 Letter was sent only to Sandman, and that DelPonte would not apologize (hereinafter the "April 5 Letter").  A copy of the April 5 Letter is attached to the Complaint as Exhibit 1 and is incorporated herein by reference.

The April 5 Letter does not state that DelPonte will not send the letter to the individuals on the "carbon copy" list or any other third parties or that he will not engage in any other misuse of Hyde Park's confidential information and trade secrets.  Exhibit 5 to the Complaint.

By his conduct, DelPonte misused confidential information pertaining to Hyde Park's clients and members of the media with whom Hyde Park does business in violation of the express terms of the employment agreement he signed as a condition of his employment with Hyde Park, as well as Hyde Park's employee policies.

Specifically, DelPonte agreed to the following terms and conditions in the Employment Agreement:

8.      Restrictive Covenants.

(a)      Non Disclosure/Confidentiality: [DelPonte] acknowledges and agrees that:

(i)      the work he is retained to perform for [Hyde Park] necessarily involves [DelPonte's] having access to certain confidential and proprietary information, including, but not limited to, **techniques**, procedures, technical data, marketing strategies, **lists of [Hyde Park's] Clients and vendors, [Hyde Park's] Client and vendor relationships**, financial information, and other similar information or documents developed or acquired by [Hyde Park] (including all information developed or acquired by [DelPonte] in the course of his employment with [Hyde Park]) (the "Confidential Information");

(ii)      the Confidential Information is a valuable, asset of [Hyde Park]; [Hyde Park] has a legitimate business interest in protecting its confidentiality; and [Hyde Park] has implemented such practices and measures as are reasonably necessary to preserve and to protect its confidentiality;

(iii)      [DelPonte] shall not use the Confidential Information or use or exploit any relationships developed during her retention with [Hyde Park] in any manner other than in furtherance of [Hyde Park's]'s interests; and

(iv)      [DelPonte] shall maintain all Confidential Information in the strictest confidence; shall not disclose the Confidential Information to any person or entity outside [Hyde Park] during the term hereof and for a period of five years subsequent to his termination, whether such termination is voluntary or involuntary; and shall return any Confidential Information in tangible form to [Hyde Park] upon such termination.

Exhibit _____, ¶ 8(a).

In addition, DelPonte agreed in the Employment Agreement in paragraph 9 to the following remedies in the event of a breach by him of the foregoing restrictions:

(a)    The parties hereto acknowledge and stipulate that breach of the restrictive covenants set forth in Paragraph 8 would irreparably harm [Hyde Park] and cause significant damage and loss to [Hyde Park] and that, in such event, [Hyde Park] would have no adequate remedy at law. The parties further acknowledge that money damages for such breach are difficult, if not impossible, to calculate and that the most appropriate relief in the event of breach would be injunctive relief. In the event of a breach or threatened breach by [DelPonte] of any of the provisions of the restrictive covenants set forth in Paragraph 8, and notwithstanding Paragraph 9(b) respecting arbitration, [Hyde Park] shall be entitled to entry of a temporary or permanent injunction, without bond of any kind, restraining [DelPonte] and his employer, affiliate, partner, or joint venturer from directly or indirectly providing professional services in violation of the restrictive covenants. [DelPonte] agrees to pay to [Hyde Park] all costs and expenses, including reasonable attorney's fees, as may be incurred by [Hyde Park] relative to obtaining a temporary or permanent injunction.

(b)    Any controversy or claim arising out of or relating to this Agreement, other than a controversy or claim arising out of breach of the restrictive covenants set forth in Paragraph 8, shall be finally resolved by arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Any such arbitration shall take place in Washington, D.C., before a single arbitrator chosen in accordance with such Rules. The arbitrator shall include arbitration costs and attorneys' fees in the award to the prevailing party in any such proceeding. The award in such proceeding shall be final and binding on the parties, and judgment on the arbitrators' award may be entered in any court having the requisite jurisdiction. Nothing in this Agreement shall require the arbitration of disputes between the parties that arise from actions, suits or proceedings instituted by third parties.

Id. at ¶ 9.

Additionally, Hyde Park has provided to all employees, including DelPonte, an employee manual which recites company-wide policies (the "Employee Manaual"). Of special importance are the following policies:

**112 Non-Disclosure**

The protection of confidential business information and trade secrets is vital to the interests and the success of Hyde Park Communications. Such confidential information includes, but is not limited to, the following examples:

* **non-public client information**
* compensation data
* customer lists
* customer preferences
* financial information
* pending projects and proposals
* **research and development strategies**

All employees may be required to sign a non-disclosure agreement as a condition of employment. Employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment, even if they do not actually benefit from the disclosed information.

### 180 General Office Policies

4.    All client and firm related matters, including clients' plans and strategies, marketing information, regulatory issues, etc. should be treated as strictly confidential unless they have been made public.  This is an important issue and relates directly to our credibility and reputation in our role as trusted advisor to our clients.  In addition, all Hyde Park internal matters, including proposals and firm business strategy should be treated as confidential.  Please place all confidential matters in your drawers when leaving the office and shut off your computer. Personnel matters.  All personnel issues, including compensation matters are strictly confidential.

A copy of the relevant pages of the Employee Manual are attached to the Complaint as Exhibit 2 and are incorporated herein by reference.

In connection with DelPonte's employment at Hyde Park, DelPonte had access to the books, records, and computers of Hyde Park and the confidential information contained therein, including the identity of Hyde Park's clients' representatives and members of the media with whom Hyde Park conducted business on behalf of its clients.

At the time that DelPonte sent the March 30 Letter, DelPonte possessed a laptop

9

computer that had been furnished to him by Hyde Park and on which resided data about Hyde Park's clients, their agents, and members of the media with whom Hyde Park conducted business. DelPonte had not returned the computer to Hyde Park despite numerous demands therefor and continues wrongly to retain the computer.

The names of Hyde Park's client contacts and the members of the media with whom Hyde Park does business on behalf of its clients has been kept secret and is a valuable resource of the company.  Through confidentiality agreements with all of its executives, including DelPonte, and through the policy enumerated in its Employee Manual, Hyde Park has used reasonable efforts to safeguard the confidentiality of the information.

## ARGUMENT

The four factors to be considered when determining whether Hyde Park is entitled to injunctive relief uniformly support the issuance of an injunction to restrict the further misuse of Hyde Park's confidential and secret information and the return of the laptop computer.  These factors are whether: 1) there is a substantial likelihood that Hyde Park will succeed on the merits of its claims; 2) Hyde Park would suffer irreparable injury if the injunction did not issue; 3) an injunction would not substantially injure other interested parties, and 4) the public interest favored issuing an injunction.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz, 298 F. Supp. 2d 27, 30-31 (D.D.C. 2002) (citing CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995); Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998)).

These four factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted.  See Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) (citing CityFed Fin. Corp. v.

10

Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)). Rather, the factors "interrelate on a sliding scale and must be balanced against each other." Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999) (citing Serono Labs. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998), on remand, 35 F. Supp. 2d 1 (D.D.C. 1999)); see also WMATA v. Holiday Tours, Inc., 559 F.2d 841, 842-43 (D.C. Cir. 1977) (Court "examines each requirement in light of the others to determine whether an injunction would be proper").

A strong showing of likely success on the merits warrants issuance of preliminary injunctive relief even if Hyde Park makes a less compelling showing on the other three factors. Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d at 72-73 (citing Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958); National Wildlife Fed'n v. Andrus, 440 F. Supp. 1245, 1256 (D.D.C. 1977) (Despite dispute over irreparable injury, the Court enjoined further construction on dam power plant, because "the court is convinced by plaintiffs' argument on the merits and therefore finds it sufficient on the question of irreparable injury").

1.    **Hyde Park has a Substantial Likelihood of Success on the Merits.**

Hyde Park is entitled to relief in that there is a substantial likelihood of success on the merits based on two separate grounds: (a) DelPonte's expressly agreed not to use or disclose Hyde Park's "confidential information" and consented to the issuance of temporary and preliminary injunctive relief to protect against any actual or threatened use or disclosure; and (b) the information about Hyde Park's client contacts and members of the media with whom Hyde Park conducts business is protected by the D.C. Trade Secrets Act.

a.    **DelPonte Breached His Non-Disclosure Covenant and Consented to**

11

**Injunctive Relief**.

Hyde Park's right to relief is clearly set forth in the express language of the Employment Agreement, which is similar to contracts enforced in <u>Merrill Lynch v.Wertz</u>, 298 F. Supp . 2d at 30.  In <u>Merrill Lynch v. Wertz</u>, the defendants against whom injunctive relief was enforced signed an employment agreement which contained non-disclosure and confidentiality provisions that they violated when they used disclosed to a new employer "client lists, customers' names, addresses, telephone numbers; and other confidential and proprietary information of Merrill Lynch regarding client accounts."  <u>Id.</u>; <u>see also</u> <u>Morgan Stanley v. Rothe</u>, 150 F. Supp. 2d at 70.

DelPonte's violations of the Employment Agreement are similar to the violations enjoined in <u>Merrill Lynch v. Wertz</u> and <u>Morgan Stanley v. Rothe</u>.[1]  While the Employment Agreement does not define the term  "Clients," the phrase "Client . . . relationships" includes the agents and representatives of the client. [CITE.]  Hyde Park depends on establishing and maintaining confidential relationships with the representatives of its clients in order to retain and develop business from that entity.  The authorized representatives therefore are no different from the individual investors who decide whether to hire a brokerage house as in the <u>Merrill Lynch v. Wertz</u> and <u>Morgan Stanley v. Rothe</u> cases.

While no reported decision in the District of Columbia, to our knowledge, has upheld the confidentiality specifically of client contacts, client contacts routinely have been accorded confidentiality protection.  <u>See</u> <u>Eden Hannon & Co. v. Sumitomo Trust & Banking Co.</u>, 914 F.2d

---

[1]    In <u>Merrill Lynch v. Wertz</u>, the injunctive relief awarded specifically precluded the defendants from " using, disclosing, or transmitting for any purpose, including contacting the clients, the information contained in the records of Merrill Lynch, including, but not limited to, the names, addresses, and financial information of the clients.  <u>Merrill Lynch v. Wertz</u>, 298 F. Supp. 2d at 35.

556, 562 (4th Cir. 1990) ("Virginia courts have also recognized that firms have a legitimate interest in protecting their customer contacts."); <u>Diversey Lever, Inc. v. Hammond</u>, 1997 U.S. Dist. LEXIS 648 (D. Pa. 1997) ("The individual defendants had access to and used in their employment with Diversey confidential information, which was developed and compiled by Diversey at great expense, including, but not limited to,...customer contacts...."); <u>Central Keystone Plating of Illinois, Inc. v. Hutchison</u>, 62 Ill.App.2d 188, 210 N.E.2d 239, 242 (1965) ( "Where there are special circumstances, such as ...customer contacts... or other confidential information, there is a greater willingness to restrain competition.")

Similarly, the members of the media with whom Hyde Park relies to communicate its customers' messages are central to ensuring that Hyde Park can achieve the results that its customers expect.  As a result, under the Employment Agreement those corporate representatives fall within the scope of "lists of [Hyde Park's] Clients and vendors, [Hyde Park's] Client and vendor relationships."  Exhibit 1 to the Complaint, ¶ 8(a)(i).  Similarly, pursuant to the Employee Manual, clients' representatives and members of the media fall within the scope of "non-public client information" and "research and development strategies."

Thus, in drafting and sending the March 30 Letter, DelPonte breached the Employment Agreement when he used the names of the representatives of Hyde Park's clients and members of the media with whom Hyde Park conducts business in a manner other than in furtherance of Hyde Park's interests.  Exhibit 1 to the Complaint, ¶ 8(A)(iii).

DelPonte also breached the Employment Agreement when, after terminating his employment, he did not return the names of Hyde Park's clients' representatives and members of the media with whom Hyde Park conducts business that were stored in the laptop computer that

Hyde Park repeatedly requested be returned. Id. at ¶ 8(A)(iv). Such information necessarily relates to the client and is the equivalent of information pertaining to investors' preferences in Morgan Stanley v. Rothe and Merrill Lynch v. Wertz.

The April 3 Letter also does not contain any promise or obligation by DelPonte not to distribute the March 30 Letter to the individuals identified in the "carbon copy list, or to use the confidential information that he retains in the future for purposes other than furthering Hyde Park's interests. Exhibit 4 to the Complaint. Hyde Park reasonably believes that DelPonte is likely to misuse the confidential information that he obtained through his employment and the scope of the misuse may be greater the next time.

As in Merrill Lynch. v. Wertz, Hyde Park seeks only to hold DelPonte to a condition to which he specifically agreed to prevent him from using the information about its client and media contacts in any way other than to further Hyde Park's interests. DelPonte expressly consented to the enforcement of injunctive relief to prohibit the breach of the Employment Agreement. Paragraph 9(a) of the Employment Agreement specifically states that "in the event of a breach of the restrictive covenants set forth in Paragraph 8, and notwithstanding Paragraph 9(b) respecting arbitration, [Hyde Park] shall be entitled to entry of a temporary or permanent injunction." Exhibit 1 to the Complaint, ¶ 9(a).

By signing the Employment Agreement, DelPonte expressly agreed to restrictions against the misuse of confidential information, restrictions that he breached in preparing and sending the March 30 Letter. He also agreed to injunctive relief to protect that confidential information. As a result, Hyde Park is likely to succeed on the merits.

**b.    DelPonte Misappropriated and Misused Hyde Park's Trade Secrets**

Hyde Park also is entitled to immediate injunctive relief to protect its trade secret customer information from further misappropriation by DelPonte.

The District of Columbia has adopted the Uniform Trade Secrets Act, D.C. Code §§ 36-401 et seq., which defines a trade secret as follows:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and

(B) Is the subject of reasonable efforts to maintain its secrecy.

D.C. Code §§ 36-401(4). Interpreting this language, this Court imposes the following requirements for the protection of information as a trade secret: "(a) the information must be secret; (b) its value must derive from the secrecy; and (c) the owner must use reasonable efforts to safeguard the confidentiality of the information." Catalyst & Chem. Servs. v. Global Ground Support, 350 F. Supp. 1 (D.D.C. 2004).

The names of Hyde Park's client and media contacts is entitled to trade secret protection under District of Columbia law. In Morgan Stanley v. Rothe, this Court recognized that a financial services firm's client list and customer information was worthy of trade secret protection under the D.C. Trade Secrets Act. Morgan Stanley v. Rothe, 150 F. Supp. 2d at 77. Other jurisdictions also have held specifically that client contact customer information is entitled to trade secret protection under the substantially identical trade secrets laws. See North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44-45 (2d Cir. 1999) (While the list of clients of an engineering firm was not a trade secret since the list could be developed from public sources, "the identities of

15

individual contact people" with whom the defendant employee dealt while with the firm "were protectable trade secrets" in that this information was "'not readily available' to others in the industry."); see also Pac. Aero. & Elecs., Inc. v. Taylor, 295 F. Supp. 2d 1188, 1200-1202 (D. Wash. 2003) ("The court finds that [plaintiff employer] will have probable success showing that...the identities of individual contact people with whom [the defendant employee] dealt with at [plaintiff company] as protectable trade secrets.") ; Webcraft Technologies, Inc. v. McCaw, 674 F. Supp. 1039, 1046 (S.D.N.Y. 1987) ("[The contacts list] is data collected on behalf of and at the expense of the [the plaintiff employer]. It is not generally available information; it is maintained in confidence and is valuable to a competitor. [The plaintiff employer] is likely to succeed on the merits in showing that the contacts list qualifies as a trade secret.").

Hyde Park does not share information related to its clients' representatives and the members of the media with whom Hyde Park works. This information is of incalculable value to Hyde Park in maintaining client relations, soliciting additional work, and promoting client interests to the media. Through its employee manual and its restrictive covenants with DelPonte and other senior executives, Hyde Park protects the trade secret information that DelPonte misappropriated and threatens to misuse again.

D.C. law permits the enforcement of injunctive relief to prevent actual or threatened misappropriation of trade secrets. D.C. Code § 36-402(a). Hyde Park is entitled to injunctive relief based on DelPonte's actual misappropriation of Hyde Park's trade secrets to intimidate and inflict emotional distress on Hyde Park and Sandman through purported disclosures to the persons on the "carbon copy" list.

Hyde Park is similarly entitled to injunctive relief based on the threat of misappropriation

16

of its trade secrets. Even if DelPonte has not yet sent the March 30 Letter to third parties, he has not said that he will not do so. The fact that the April 3 Letter does not include any statement that DelPonte will not send the March 30 Letter to third parties is indicative of a substantial threat of misappropriation of Hyde Park's trade secrets. DelPonte did not return the trade secret information to Hyde Park in December 2005 after termination of his employment and then demonstrated a willingness to misappropriate the information in the March 30 Letter. Unless DelPonte is enjoined, he could misuse it again.

In sum, DelPonte's retention of Hyde Park's trade secret information after the termination of his employment, misuse of that trade secret information in preparing and sending the March 30 Letter, and creation of a threat of likely future misappropriation suffice for the enforcement of injunctive relief under the DC Trade Secret Act.

**2.      Hyde Park Will Suffer Irreparable Harm if Injunctive Relief Is Not Granted**

Hyde Park will suffer irreparable harm unless immediate injunctive relief is awarded to prevent DelPonte from continuing to misuse Hyde Park's confidential information and trade secrets to defame Hyde Park and Jeffrey Sandman to Hyde Park's clients, their agents, and members of the media with the consequent irreparable loss of the confidence and trust of clients and of business reputation and goodwill. This Court has awarded injunctive relief against claims of similar irreparable injury. In Morgan Stanley v. Rothe, this Court found irreparable harm based on the incalculability of the damages that flow from a loss of confidentiality of customer information and the concomitant loss of customer trust and goodwill. Morgan Stanley v. Rothe, 150 F. Supp. 2d at 76-78.

**a.      Hyde Park's Clients Will Lose Confidence in Hyde Park's Protection of**

17

**Their Confidential Information**

Hyde Park's clients expect the information that they submit to Hyde Park will remain confidential. Unless enjoined, DelPonte is likely to continue to misuse the clients' confidential information and trade secrets, and therefore destroy the clients' confidence in Hyde Park to protect their sensitive information. This in turn is likely to result in irreparable harm that will threaten the very existence of Hyde Park's business.

As noted in <u>Morgan Stanley v. Rothe</u>, Hyde Park "does not make cars or sell food." <u>Morgan Stanley v. Rothe</u>, 150 F. Supp. 2d at 77-78 . Instead, Hyde Park sells intangible services like the brokerage houses in <u>Morgan Stanley v. Rothe</u> and <u>Merrill Lynch v. Wertz</u>, and, like those brokerages, Hyde Park depends on its clients' confidences in Hyde Park's protection of its confidential information. Specifically, Hyde Park's work with each client requires that the client share essential information, including information about their finances, litigation, public investigations, financial difficulties, campaigns, etc. This client information is highly sensitive, and Hyde Park needs the client to feel at ease in sharing it with Hyde Park in order for Hyde Park to develop carefully scripted messages that are communicated with the public. If the information is misused, then the trust will be broken and the client will begin to feel that its confidences are not safe with Hyde Park and that Hyde Park will not be able to provide quality services. Such a loss of client threatens the very existence of Hyde Park's business.

**b.    Loss of Business Reputation and Goodwill**

The imminent loss by Sandman and Hyde Park of the reputation and goodwill resulting from the disclosure of confidential client information and trade secrets and false information--

18

reputation and goodwill developed in this case over decades of work-- serves as sufficient basis for this Court to enforce injunctive relief against DelPonte.  As noted by this Court in Morgan Stanley v. Rothe, the loss of goodwill and reputation is "concomitant" with the loss of customer trust.  Morgan Stanley v. Rothe, 150 F.Supp. 2d at 77.

Here, the risk is particularly compelling since DelPonte has misused the client and media contact information to inflict emotional distress, and he threatens to publish defamatory statements.  Portrayal of an individual as morally corrupt enough to jeopardize a child's health prior to surgery as part of a game of "Catch 22" certainly reflects on the individual's character. Sandman has extensive experience that was developed over many years through diligent work.  In order to achieve his success, Mr. Sandman has necessarily had to develop an excellent reputation for integrity and for the ability to produce successful results for his clients.  If the factually incorrect ad hominem charges contained in the March 30 Letter were published, it would constitute defamation of Hyde Park's and Sandman's character and reputation.  Such defamation would necessarily result in a loss of reputation and goodwill to Sandman and to his company that cannot be fully recompensed through monetary damages.

Current and historic revenues also do not take into account the expenses incurred in building and retaining a clientele.  Hyde Park sells an intangible product and therefore must spend significant amounts each year on building and retaining its clientele.  Such work includes, but is not limited to advertising, maintaining relationships, research of industries and issues relevant to current and potential clients' interests, training employees, etc.  See Morgan Stanley  v. Rothe, 150 F. Supp. 2d at 77 ("[i]n particular, the court shares the view of Mr. Tilahun, who states that 'Morgan Stanley's customer list is the lifeblood of its business' and that the company spends

19

millions of dollars each year to build and retain its clients").

In sum, DelPonte's misuse of Hyde Park's confidential information and factually incorrect statements, together with his subsequent failure to apologize and state that he would not misappropriate the information again, is a indication of imminent future misuse. This misuse will result in irreparable harm to Hyde Park's clients' confidence in the company's protection of confidential information, irreparable harm to the goodwill and reputation that Hyde Park and Sandman have crafted over many years of hard work, and such damage cannot be calculated.

**3.    The Benefits of Injunctive Relief Outweigh Any Detriment to DelPonte and Serve the Public Interest**

The benefit of injunctive relief to Hyde Park far outweighs any detriment to DelPonte and serves the public interest. An injunction would protect Hyde Park's goodwill, business reputation, and contract rights. Equally importantly, however, an injunction would promote the public interest by protecting Hyde Park's trade secret information and the confidentiality of Hyde Park's clients' records. Morgan Stanley v. Rothe, 150 F. Supp 2d at 79 ("[t]he court agrees with the plaintiff that by issuing an injunction, the court serves the public interest in protecting trade secret client lists and other confidential information, an interest reflected by the adoption of the D.C. Uniform Trade Secrets Act").

By misusing the client and media contact information, DelPonte has breached the Employment Agreement and misappropriated Hyde Park's trade secrets. An injunction will hold DelPonte to the bargain that he struck when he came to work for Hyde Park. It will not prevent DelPonte from earning a living. As this Court previously stated in a similar case:

> The temporary restraining order entered by the Court . . . merely holds the
> defendants to the promise they made when they voluntarily entered their

20

employment agreements with Merrill Lynch. Moreover, the Court believes the public interest is served by protecting confidential business information and trade secrets, and enforcing valid contractual provisions, to which parties have voluntarily entered.

Merrill Lynch v. Wertz, 298 F. Supp. 2d at 34-35.

## CONCLUSION

For the reasons set forth above, Hyde Park requests that this Court issue a temporary restraining order and preliminary injunction against DelPonte to prevent further misuse of Hyde Park's confidential information and trade secrets and to require the return of the Hyde Park computer that DelPonte unlawfully detains.

Respectfully submitted,

SPIRER & GOLDBERG, P.C.


_____/s/_____
Fred B. Goldberg
Bar #279893
7101 Wisconsin Avenue
Suite 1201
Bethesda, MD 20814
Attorney for Plaintiffs

21