UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HYDE PARK COMMUNICATIONS, INC. et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case Number: _____ |
| ) | |
| PAUL DELPONTE ) | |
| ) | |
| Defendant. ) | |

**AFFIDAVIT OF JEFFREY SANDMAN**

I, Jeffrey Sandman, do depose and say as follows:

1.  I am over the age of 18, and I make this affidavit on my personal knowledge.

2.  I am the President and a director of Hyde Park Communications, Inc. a corporation organized and operating under the laws of the District of Columbia, with its principal place of business at 1101 17th St., N.W., Suite 508, Washington, DC 20036 (hereinafter "Hyde Park"). Hyde Park is a successor to Hyde Park Communications, LLC (hereinafter "Hyde Park LLC") through a merger between Hyde Park and Hyde Park LLC effective January 1, 2001.

3.  I am a founder of the Hyde Park entities, and I have been employed by them since their creation.

4.  I submit this affidavit in support of Hyde Park's motion for injunctive relief against defendant Paul DelPonte (hereinafter "DelPonte").

5.  Hyde Park is a public affairs, corporate communications, and media relations firm with a clientele that includes Fortune 500 companies, major foundations, and national advocacy and membership organizations.

1

6. Between February 8, 2000, and December 5, 2005, DelPonte served continuously as an employee of the Hyde Park entities. I am personally familiar with the facts and circumstances of DelPonte's employment with the Hyde Park entities and his conduct towards Hyde Park since the termination of his employment.

7. On or about February 8, 2000, DelPonte became bound by an employment agreement (hereinafter the "Employment Agreement") whereby DelPonte accepted a position as an employee of Hyde Park LLC. As authorized under the terms of the Employment Agreement, the rights and obligations of the Employment Agreement were assumed by Hyde Park in connection with the merger of the two Hyde Park entities.

8. Pursuant to a shareholder agreement entered into on or about January 1, 2001 (hereinafter the "Shareholder Agreement"), DelPonte became the owner of one hundred and seventy-five (175) shares of common stock of Hyde Park.

9. Pursuant to the Shareholder Agreement, I became the owner of seven hundred (700) shares of common stock of Hyde Park, and I am the majority shareholder of Hyde Park.

10. In connection with DelPonte's employment at Hyde Park, DelPonte had access to the books and records of Hyde Park and the confidential information contained therein, including the identity of representatives of Hyde Park's clients and members of the media with whom Hyde Park has conducted business on behalf of its clients.

11. In consideration of the benefits and opportunities provided by Hyde Park to DelPonte, DelPonte agreed in the Employment Agreement in paragraph 8 to restrictions regarding the use of Hyde Park's confidential information. (See Exhibit 1 to the Complaint).

12. In consideration of the benefits and opportunities provided by Hyde Park to DelPonte,

DelPonte agreed in the Employment Agreement in paragraph 9 to a variety of remedies in the event of a breach by him of the foregoing restrictions. (<u>See</u> Exhibit 1 to the Complaint).

13.     Additionally, Hyde Park provides to all employees, including DelPonte, an employee manual which sets out a number of company-wide policies respecting the non-disclosure of confidential information.

14.     On or about December 5, 2005, DelPonte's employment with Hyde Park terminated. DelPonte remains a shareholder of Hyde Park.

15.     During negotiations between Hyde Park and DelPonte, DelPonte has claimed that Hyde Park owes him for work performed pursuant to the Employment Agreement and distributions of Hyde Park profits. DelPonte is also eligible to have his shares purchased by Hyde Park.

16.     On March 30, 2006, DelPonte sent a letter by facsimile to Hyde Park and to me that contained false statements and evidenced, I believe, a breach by DelPonte of the Employment Agreement and of the District of Columbia Uniform Trade Secrets Acts. D.C. Code, 36-401 <u>et seq</u>. (hereinafter, the "March 30 Letter"). A copy of the March 20 letter accompanies a Motion to File Document Under Seal filed in connection with the filing of the Complaint.

17.     Among the false assertions in the March 30 Letter, DelPonte accused me of "disturbing attempts to withhold company profits that have already been reported to the IRS." I understand such language to mean that Hyde Park and I wrongfully failed to remit amounts actually owed to the IRS. Hyde Park has always timely reported all profits to the IRS and to the company stockholders.

18.     I do not believe that either the Shareholder Agreement or the law gives DelPonte, or any

other Hyde Park shareholder, the ability to compel a distribution. Pursuant to the Shareholder Agreement, the Board of Directors may authorize a distribution if, in its sole judgment, such a distribution is in the best interests of the corporation and the corporation has net assets adequate to support the distribution. The Board has, from time to time, exercised that authority to cause Hyde Park to make distributions in the form of cash dividends.

19.     DelPonte also stated falsely that I "randomly picked" an "artificial" deadline of March 18, 2006, for DelPonte to obtain health coverage for the month of April and that I did this as "a bargaining tool in an attempt to force [DelPonte] to settle for an offer drastically undervaluing the money you and Hyde Park Communications owes me."

20.     Hyde Park had no obligation to keep DelPonte on its health insurance policy. When DelPonte left the company's employ in December 2005, DelPonte was told that Hyde Park could and would maintain his coverage for three months to the end of March 2006.

21.     In an email from Hyde Park's counsel to DelPonte's counsel, dated February 23, 2006, Hyde Park presented a settlement proposal that included an extension of health insurance coverage through June 2006 (after the company first learned that this was feasible), with an indication that the premium payments would have to be made by the 15th day of the previous month.

22.     In a subsequent email between counsel dated March 9, 2006, Hyde Park extended the deadline for acceptance of the proposal and payment of the April premium to March 18. The deadline was intended to give Hyde Park sufficient notice so that either the premium could be remitted if the parties reached an agreement and DelPonte elected coverage or notice of termination of coverage could be delivered if no settlement was reached or DelPonte elected not

to be covered.

23. DelPonte further falsely asserted that his attorney "specifically asked if the March 18 deadline that [I] randomly picked to discontinue [DelPonte's] health insurance was in fact correct. There was no response from you or your attorney." As a result, according to DelPonte, he "was denied purchasing a new policy from another insurance carrier because I was told I already had a policy from Hyde Park."

24. Neither Hyde Park nor I ever received any letter from DelPonte's attorney inquiring whether the March 18 deadline "was in fact correct." Instead, Hyde Park's counsel received a letter dated March 23 confirming that Mr. DelPonte's health insurance would be lapsing (as was correct) and requesting notice only if Hyde Park's understanding were otherwise. Neither Hyde Park nor I responded because our understanding agreed with DelPonte's.

25. DelPonte also falsely asserted that his trouble obtaining health insurance was actually a result of my "twisted game of Catch 22 [which] came dangerously close to putting scheduled surgery for my son next week at risk."

26. As noted in paragraph 24, I did not engage in any "game" of Catch 22; nor did I do anything improper.

27. DelPonte closed the March 30 Letter with a carbon copy list of twenty-one individuals to whom DelPonte indicated he had sent or intended to send copies of the letter.

28. The individuals listed on the carbon copy list consisted of representatives of Hyde Park's clients and members of the media with whom Hyde Park has conducted business on behalf of its clients. The clients whose representatives appeared as addressees have been responsible for generating more than fifty percent (50%) of Hyde Park's historic revenues.

29. I became distraught that the distribution to the persons on this list of the false and inflammatory contents of the March 30 Letter would destroy the reputation and goodwill that I had established over years of diligent work.

30. In order to mitigate the unwarranted injury likely to flow from the March 30 Letter, I sent a letter to the individuals listed on the carbon copy list of that letter, stating that the complaints had no merit. (See Exhibit 3 to the Complaint).

31. On April 3, 2006, Hyde Park's attorney sent a letter to DelPonte's attorney in which he raised concerns about the veracity of the contents of March 30 Letter, the letter's publication to third parties, and resulting defamation, violation of trade secrets law, and breach of the Employment Agreement. (See Exhibit 4 to the Complaint).

32. In the April 3 letter, Hyde Park's attorney requested that DelPonte apologize for his defamatory remarks and refrain from any further publication. The April 3 letter noted that Hyde Park and I were entitled to seek injunctive relief and that we reserved the right to do so. (See Exhibit 4 to the Complaint).

33. On April 5, 2006, DelPonte's attorney wrote to Hyde Park's lawyer that, notwithstanding the appearance of the carbon copy list, the March 30 letter had been sent only to Hyde Park and me and that DelPonte would not apologize. (See Exhibit 5 to the Complaint).

34. The April 5 letter does not state that DelPonte will not yet send the letter to the individuals on the carbon copy list or any other persons.

35. The March 30 letter caused me great anxiety. I had difficulty eating, sleeping, concentrating, and carrying on the other usual activities of living.

36. At the time that DelPonte sent the March 30 letter, DelPonte possessed a laptop computer

that had been furnished to him by Hyde Park and on which resided data about Hyde Park's clients, their agents, and members of the media with whom Hyde Park conducts business.

37. DelPonte had not returned the computer to Hyde Park despite repeated demand therefor and continues wrongly to retain the computer.

38. According to my information and belief, Hyde Park is entitled recover possession of the chattels, i.e., the laptop computer and data stored therein related to representatives of Hyde Park's clients and members of the media with whom Hyde Park has conducted business on behalf of its clients, that is proposed to be replevied, being the same described in the complaint; (2) DelPonte has seized and detained or details those chattels; and (3) those chattels were not subject to the seizure or detention and were not taken upon a writ of replevin between the parties.

39. The information about representatives of Hyde Park's clients and members of the media with whom Hyde Park conducts business on behalf of its clients constitutes "confidential information" pursuant to the Employment Agreement and a trade secret pursuant to the District of Columbia Uniform Trade Secret Act.

40. Hyde Park does not make public information related to its clients' representatives and the members of the media with whom Hyde Park works. This information is of incalculable value to Hyde Park in maintaining client relations, soliciting additional work, and promoting client interest to the media. Through its employee manual and its restrictive covenants with DelPonte and other executives, Hyde Park protects the trade secret information that DelPonte misappropriated and threats to misuse again.

41. Pursuant to paragraphs 9(e) and (f) of the Employment Agreement, Hyde Park is entitled to the certain liquidated damages for DelPonte's violation of paragraph 8(a) of the Employment

Agreement.

42. Unless DelPonte's conduct is immediately enjoined, DelPonte will be free to continue to misuse Hyde Park's confidential information (a) to inflict irreparable emotional distress on me and (b) to defame Hyde Park and me to Hyde Park's clients, their agents, and members of the media with the consequent irreparable loss of the confidence and trust of clients and of business reputation and goodwill.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 10, 2006.

_____/s/_____<br>
JEFFREY SANDMAN